Merrimack, } No. 3980.
Dec. 5, 1950. }

STATE *v.* FRANK GORDON KIMBALL.

*Kenneth F. Graf* and *Stanley M. Brown* (*Mr. Brown* orally), for the plaintiff.

*Thomas L. Marble* and *Mayland H. Morse, Sr.* (*Mr. Marble* orally), for the defendant.

LAMPRON, J. The plaintiff based its action upon the manner in

which specific payments of capital budget funds totalling $658,725., and of general funds in the amount of $5,069.90, were made by the defendant as State Treasurer during the period of January 3, 1947, to March 3, 1948. The Trial Court found that "each disbursement concerning which claim is made by the plaintiff was made by the defendant prior to the receipt by the defendant of a Governor's warrant authorizing the specific expenditure of public funds from the state treasury, and the moneys were issued by the defendant out of the treasury of the State and disposed of, prior to the receipt of any such warrant authorizing the specific disbursement. . . . The defendant made all of the disbursements complained of, and issued the moneys out of the treasury and disposed of the same, on manifests which did not contain the signatures and certificates of the heads of departments concerned and subordinate officers responsible within the department. . . ." These manifests were initiated and executed by the Comptroller or his subordinates.

The defendant does not contend that the above findings are without support in the evidence but excepts to them as immaterial because, among other reasons, the Court further found that "[i]n making disbursements of public funds of the State of New Hampshire in advance of receipt of Executive Warrants, . . ." and "[i]n honoring Manifests signed by the Comptroller or by some individuals in the comptroller's office instead of by heads of departments, the defendant acted in good faith."

The verdict of $237,518.55 is the total amount of public funds "used, expended, disbursed, issued out of the treasury and disposed of to the said Cote organizations in excess of specific appropriations [of capital budget funds] for the specific capital improvements and long term repairs . . ." provided for by Laws 1945, c. 210 and Laws 1947, c. 294.

The Constitution, Part Second, Article 5, authorizes the General Court to levy taxes "to be issued and disposed of by warrant, under the hand of the [governor] of this state for the time being, with the advice and consent of the council, for the public service, in the necessary defense and support of the government of this state, and the protection and preservation of the subjects thereof, according to such acts as are, or shall be, in force within the same." Article 56 provides: "No moneys shall be issued out of the treasury of this state, and disposed of, . . . but by warrant under the hand of the governor for the time being, by and with the advice and consent of the council, for the necessary support and defense of this state, and for the necessary

protection and preservation of the inhabitants thereof, agreeably to the acts and resolves of the general court."

R. L., c. 22, s. 9 provides that "The treasurer shall pay, out of any moneys not otherwise appropriated, all sums due by virtue of general or special appropriations of the legislature, on warrants drawn by the governor, and the principal or interest on all loans which may at any time become due."

The constitutional and statutory procedure by which moneys shall be "issued out of the treasury of the state" is plainly established. It requires that there be an appropriation, or equivalent direction for payment, by the Legislature (R. L., c. 22, s. 9; Ib., c. 27, s. 1); Opinion of the Justices, 72 N. H. 601, 603; that all accounts to be presented to the governor and council for the issuance of warrants shall be pre-audited by the comptroller who is charged with keeping the "central or general accounts of the state" (R. L., c. 23, s. 14 (1), (4)); and that payment shall be made by the Treasurer only upon warrant "under the hand of the governor . . . with the advice and consent of the council." Const. supra. The State Treasurer may not lawfully pay claims against the State "of his own motion"; he may "only draw out the money under an executive warrant, which presumably would not be given except in accordance with a statute authorizing it." Bow v. Plummer, 79 N. H. 23, 24.

The provisions of the Constitution and statutes concerning the issue of money out of the state treasury are not without purpose. Their function is "to insure that no payments should be made from the public treasury except for public purposes and in accordance with the law." Willar v. Commonwealth, 297 Mass. 527, 529. (The Constitution of Massachusetts contains provisions identical with Articles 5 and 56 of our Constitution. Const. of Mass. Pt. II, c. 1, s. 1, Art. IV; Id., c. 2, s. 1, Art. XI. Established for more than mere convenience, the requirements constitute a safeguard against unlawful payments from the treasury. Their dictates are not lightly to be disregarded.

The warrant of the Governor is the Treasurer's authority to make payment. Addressed to him, it directs him to "pay to the persons named on the annexed schedule or their order, the sum set against each name, amounting in the aggregate to—dollars for which this shall be your sufficient warrant." Such an instrument is not peculiar to New Hampshire. "A warrant is the command of the . . . official, whose duty it is to pass upon the validity and determine the amount of a claim . . . , to the treasurer to pay money out of any funds in the . . .

treasury which are or may become available for the purpose specified, to a designated person whose claim therefor has been duly adjudged and allowed." 2 Dillon, Municipal Corporations (5th *ed.*) 1283; *Excise Board* v. *Gulf Pipe Line Co.*, 156 Okla. 103. See also, *Hornblower* v. *City of Pierre*, 241 F. 450, 453.

The warrant serves a double purpose. Beside safeguarding the public treasury, it protects the Treasurer as to payments made by him in compliance therewith, at least without knowledge of any defect therein. We do not subscribe to the theory that the liability of the Treasurer is that of an insurer. See *Brown* v. *Collins*, 53 N. H. 442; *Bowdler* v. *Company*, 88 N. H. 331, 333; *Cf. Bird* v. *McGoldrick*, 277 N. Y. 492. "We are not to be understood as holding that a public treasurer, who disburses public money on warrants, . . . fair upon their face, in good faith, and without knowledge of the facts showing the illegality of the claim upon which the . . . warrant purports to have been issued, may be made liable for a return of the money upon a showing that the claim was not in fact a legal charge against the municipality he represents. In such a case he would undoubtedly be protected." *Buyck* v. *Buyck*, 112 Minn. 94, 100; 43 Am. Jur. 111. See also, *Kelley* v. *Noyes*, 43 N. H. 209; *State* v. *Weed*, 21 N. H. 262.

In the absence of reasonable ground to think otherwise, the State Treasurer may assume that the Governor and Council will not draw warrants upon the treasury in a particular case unless some existing act or resolve of the Legislature authorizes payment. *Opinion of the Justices*, 72 N. H. 601. If in good faith and without knowledge of the absence of an appropriation, he pays out public funds in compliance with duly executed warrants, he will incur no liability. *Kelley* v. *Noyes, supra.*

When, however, as in this case, the Treasurer chooses to disburse funds in his custody with knowledge that the required authorization by the Governor and Council is lacking, he takes the risk of liability for his irregular action. The payments for which the verdict against the defendant was returned were payments for work done on property of the state, and exceeded any appropriations made by the Legislature. For these excess payments the State was under no liability and could not have been sued. *Opinion of the Justices*, 72 N. H. 601, 603; *Bow* v. *Plummer*, 79 N. H. 23, 24. Moreover the value received by the State for work done was less than the amount of the appropriations for such work. Thus, it cannot be doubted that the contractor received payments at least in the amount of the verdict which he was not entitled

to receive and for which the State received no value, and for which he could not have sued the State.

In this situation we think it plain that the defendant's liability is established. In *Lowell* v. *Massachusetts Bonding & Ins. Co.*, 313 Mass. 257, conflicting views upon the liability of a custodian of public funds for disbursement of the same without warrant were carefully analyzed. In adopting the view which held a municipal treasurer liable for irregular disbursement of funds in payment of obligations for which the municipality would not have been liable, but allowing credit for benefits for which it would have been liable, the court (*p.* 271) said: "It does not mulct in punitive damages the official who satisfies valid obligations of the city. . . . It does not allow the city to make a profit out of his irregular conduct in the satisfaction of obligations which the city was bound to pay." Since the verdict represents payments which satisfied no valid obligation of the State, the defendant was properly held liable unless the payments were otherwise authorized. *Lowell* v. *Massachusetts Bonding & Ins. Co.*, *supra; State* v. *Baetz*, 44 Wis. 624. See also, *Savage* v. *Neal*, 151 Tenn. 70; Anno. 146 A. L. R. 762, 769; 4 McQuillin, Municipal Corporations (3rd *ed.*) *s.* 12.217.

The defendant argues that he was expressly authorized to make payment in anticipation of executed warrants by virtue of two resolutions of the Governor and Council, pursuant to the provisions of R. L., *c.* 14, *s.* 13, as amended by Laws 1943, *c.* 21, *s.* 2; "WORKING CAPITAL. The governor is hereby authorized to draw his warrant on any money in the treasury not otherwise appropriated for such sums to be set apart to the credit of the state treasurer as working capital as may appear to the governor and council necessary ·and proper for the prompt payment of bills contracted by the state and for such other claims against the state, duly approved, as the governor and council may specifically direct." Neither of the resolutions relied upon can be held to justify payments made by the defendant. The first resolution adopted in 1938 provided as follows: "The Governor and Council authorized the State Treasurer to segregate such fund accounts into bank accounts as he deems advisable for the establishing of Working Capital Accounts, in accordance with chapter 9, section 13 of the Public Laws." (R. L., *c.* 14, *s.* 13.) This resolution went no further than to authorize segregation of funds into bank accounts for use as working capital within a $300,000 limit established by a resolution in 1936. The second resolution adopted December 2, 1947, at the request of the defendant, while purporting to establish "all state

funds . . . on a working capital basis" must be construed with reference to the statute under which it was adopted. R. L., *c*. 14, *s*. 13, *supra*. The authority of the Governor to draw his warrant for the purpose of establishing working capital is expressly limited to use of funds "not otherwise appropriated." This authority can hardly be held to extend to capital budget funds expressly required by statute to be applied solely to the purposes for which appropriated. Laws 1945, *c*. 210; Laws 1947, *c*. 294. The history of the statute indicates that it was designed merely to provide for prompt payment for "materials and supplies" for institutions and departments. Laws 1919, *c*. 14. "If statutes protecting public funds are to have any effect and force they should not be emasculated by judicial interpretation and relaxation of their provisions." *Alexander* v. *Ritchie*, 53 S. E. (2d) 735, 740 (1949).

The defendant further relies upon the finding of the Court that in making disbursements in advance of receipt of executive warrants he acted in good faith. This finding of the Court is warranted by the evidence, in the sense that he acted with honest intention and without purpose to defraud or deceive. *Appel* v. *Morford*, 62 Cal. App. (2d) 36. In making payment in advance of receipt of warrants the defendant followed a practice which had been openly pursued for some six years, to the knowledge of Comptrollers and Governors who preceded the incumbents at the time the transactions here involved took place. To the good fortune of the State, no losses occurred during that period. The record in this case contains no suggestion that the defendant was aware of the losses which were occurring by reason of the payments made in 1947 and 1948. But a "mistake as to his duty and honest intention will not excuse the offender." *Amy* v. *The Supervisors*, 11 Wall. (U. S.) 136, 138. See also, *Logan County* v. *Edwards*, 206 Ky. 53, 56; *Mines* v. *Del Valle*, 201 Cal. 273, 289; 43 Am. Jur. 97. Neither good faith, where no discretion is granted, nor reliance upon unauthorized practice, can relieve the defendant of liability for his failure to observe duties expressly prescribed by law. "Such practical construction cannot control the plain meaning of a statute. . . ." *West* v. *Railroad*, 81 N. H. 522, 530. See *Opinion of the Justices*, 90 N. H. 568, 572.

The defendant further argues that all payments in question were ultimately authorized by executed warrants and that the State would have suffered the same losses regardless of the payments made by him in anticipation of those warrants. The argument overlooks the finding of the Trial Court that "for each disbursement involved here

the money was issued by the defendant out of the treasury and disposed of prior to the receipt of any warrant authorizing the specific disbursement." The fact that the contractor might have received the payments by virtue of later warrants, unauthorized because in excess of appropriation, does not alter the fact that he actually received them in consequence of the defendant's payments in violation of law. The State's loss was suffered before the warrants were issued. No payments were made in reliance upon the warrants when issued and they were not acted upon by the defendant. The money had already been issued out of the treasury and was irretrievably beyond the State's control. The fact that violation of duty by some other official would have occasioned the loss if the defendant's misconduct had not should not excuse the defendant. "A rule which would give a wrongdoer a way of escape by showing that others would have wrongfully inflicted the injury if he had not is plainly untenable." Peaslee, Multiple Causation and Damage. 47 Harv. L. Rev. 1127, 1138. "It does not alter the defendant's causal connection with consequences to show that had his acts not caused them, similar consequences would have been produced by some other cause." Harper, Torts, 255.

If it may be said that the defendant's acts in paying without a warrant resulted from the erroneous or wrongful approval of manifests by the Comptroller, or from expectation that warrants would eventually be issued by the Governor and Council based upon the same improper approval, the defendant is not thereby excused from liability. His action was freely taken without compulsion and with knowledge that the required authorization by the Governor and Council was lacking. Having chosen unnecessarily to rely upon certification by the Comptroller rather than by the executive on whom the law authorized him to rely, he may not now avoid the responsibility which he thus assumed by proof that other wrongs may have contributed to the loss.

In the view here taken, it is unnecessary to determine the extent of the Treasurer's duty to know whether payments made exceeded existing appropriations or the effect, if any, of the provisions of Laws 1931, c. 171, s. 16 thereon. Cf. Ib. s. 19; R. L., c. 22, ss. 3, 9. For this reason also, the defendant's exceptions to the findings and rulings relating to such a duty, or to the denial of requests relating thereto, need not be considered.

The plaintiff has taken no exception to the verdict but has moved for judgment on it. Since the defendant is liable in at least the amount

of the verdict, it is sustained.

*Judgment on the verdict.*

JOHNSTON, C. J., dissented: KENISON, J., did not sit: the others concurred.

JOHNSTON, C. J. *dissenting:* Instead of holding the defendant liable for expending public funds in excess of the amounts voted by the Legislature as the Trial Court found and ruled, the majority opinion declares his personal liability on a different ground, namely, that of disbursing such funds without having received at the time warrants from the Governor with the advice and consent of the Council.

I submit that this was not fault and that if it was, it could not be found legally causal of the State's loss.

Section 13 of chapter 14 of the Revised Laws, as amended by Laws 1943, chapter 21, section 2 authorized the setting apart of such money in the treasury to be working capital as the Governor and Council should deem necessary. As interpreted over a period of years this put all funds of the State on a working capital basis and there were no longer separate funds for working capital and for other purposes. If the statute is in conflict with Article 56 of the Constitution, the defendant who acted in good faith should be protected. "It is in general held that officers are not liable for paying out public money in reliance on an unconstitutional statute where the payment was made in good faith before the law was held unconstitutional." 43 Am. Jur. 112. To the same effect are: *Fergus* v. *Brady*, 277 Ill. 272; *Gordon* v. *Conner*, 183 Okla. 82; 60 Harv. L. Rev. 443, 444.

All of the payments in question were covered by warrants from the Governor and Council within periods of two weeks or so. These warrants were prepared by the State Comptroller for execution, the same official who forwarded manifests to the Treasurer's office with certification that the bills attached and enumerated were proper for payment.

The subject of legal causation has been much discussed in the cases, textbooks and legal periodicals. No one has produced a concise, clear and comprehensive definition of what it is. Edgerton, Legal Cause, 72 U. of Pa. L. Rev. 211. It is generally agreed that it must consist of a cause in fact that is a substantial factor in bringing about harm for which it is just to hold the actor responsible. Restatement, Torts, *ss.* 9, 431; *Labor* v. *Public Service Co. of N. H.*, 92 N. H. 256; *Johnson* v. *Railroad*, 83 N. H. 350, 359. Under this definition, it is fair to state

that the mere disbursement of money, although a cause in fact of the loss measured by the excess of payments over fair value received, was not legally causal of the damage suffered. At most the legal cause would be the manner of disbursing, paying without the authority of the executive warrant. This can fairly be described as an omission rather than a commission.

The payments complained of were not a substantial factor in bringing about the damage. It cannot reasonably be said that the loss would not have occurred if the defendant had waited because the warrants did come down within a few days authorizing all payments made. The defendant knew that they would because they were prepared by the same official who certified to him for payment the bills covered. Under these circumstances, it cannot be said that the failure to wait for the warrants was a substantial factor in·the loss due to deficient value received. The omission of the warrant at the time of payment was no cause at all, because the damage would have happened anyway.

It is not just to hold the defendant liable for losses that were bound to take place anyway because of incorrect warrants when his only fault, if any at all, was to anticipate said warrants in accordance with statutory authority (Laws 1943, c. 21, s. 2) and practice sanctioned by the Governor and Council over the years. The only risk that the defendant can justly be said to have taken in paying in anticipation of warrants was that the warrants might not be forthcoming or that they would authorize payments in lesser amounts. This risk did not ripen into loss.

In *Lowell* v. *Massachusetts Bonding & Ins. Co.*, 313 Mass. 257, the auditor had been expressly instructed not to approve certain claims. The Treasurer made payment without the required approval which it was certain he would never receive.

The majority decision holds the defendant responsible on a theory of liability that has become discredited in this court. "Under the rule announced in *Johnson* v. *Railroad*, 83 N. H. 350, 364, the want of an operator's license was 'causal in the strictest sense' of any accident in which an unlicensed operator of a motor vehicle was involved. This arose from an interpretation of the statute (then P. L., c. 101, s. 9, now R. L., c. 117, s. 9), making it a misdemeanor for an unlicensed person to operate a motor vehicle on the highway. By the interpretation, civil liability was made to depend solely upon the driver's possession or lack of a license." *Mandell* v. *Company*, 94 N. H. 1, 3. Although relief from the principle of the *Johnson* case was said to

have been obtained by means of a statutory amendment to P. L., *c.* 101, *s.* 9, enacted by Laws 1937, *c.* 69, rather than by a direct overruling, it is fair to say that this principle has ceased to be law. "It is a matter of common knowledge that the rule in the *Johnson* case has been freely criticized as unduly harsh and unrealistic." *Mandell* v. *Company, supra,* 3.

Whenever a violation of a statute is claimed to be causal of damages, it is necessary to ascertain the intention of the Legislature in passing the statute. In the circumstances of the *Johnson* case, it was not the intention of the Legislature, in making it a misdemeanor for an unlicensed person to operate a motor vehicle on the highway, to make him an insurer against all accidents on the highway in which he might be involved and to allow him no recovery regardless of fault. In the present case, it is not a reasonable construction of the Constitution and the statute requiring disbursements by the State Treasurer on executive warrants to make him an insurer against all improper payments where such warrants are lacking. The purpose of the law is additional protection for the State, not to penalize the Treasurer. In not waiting for the warrant, he takes the risk that it will not authorize the payment made; he does not become an insurer that the payments are proper in every respect. Liability as an insurer should not be imposed on anyone without a clear expression of the legislative intent to that effect.